# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

_____

MONTANA SHOOTING SPORTS
ASSOCIATION, SECOND
AMENDMENT FOUNDATION,
INC., and GARY MARBUT

                                               CV-09-147-DWM-JCL

              Plaintiffs,

vs.                       FINDINGS &RECOMMENDATION
                                    OF UNITED STATES
                                    MAGISTRATE JUDGE

ERIC H. HOLDER, JR., ATTORNEY
GENERAL OF THE UNITED STATES
OF AMERICA,

              Defendant.

_____

Plaintiffs Montana Shooting Sports Association, Second Amendment

Foundation, and Gary Marbut bring this declaratory judgment action seeking a

determination that they may manufacture and sell firearms under the recently

enacted Montana Firearms Freedom Act without complying with Federal firearms

laws.  They invoke federal question jurisdiction under 28 U.S.C § 1331. Defendant

Eric H. Holder, Jr., Attorney General of the United States of America ("United

States"), has moved under Federal Rule of Civil Procedure 12(b) to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

To the extent Plaintiffs seek judicial review under the Administrative Procedures Act, they have not shown final agency action. Furthermore, because Plaintiffs do not have standing to pursue their claims for declaratory and injunctive relief, this case should be dismissed in its entirety for lack of subject matter jurisdiction. Even if presiding United States District Court Judge Donald W. Molloy were to disagree, and conclude on review of the undersigned's Findings and Recommendation that there is subject matter jurisdiction, Plaintiffs have failed to state a claim upon which relief may be granted and their Second Amended Complaint should be dismissed.

## I.      Background

The Montana Firearms Freedom Act ("the Act"), Mont Code Ann. § 30-20-101, et seq., is a product of Montana's 2009 legislative session. The Act, which went into effect on October 1, 2009, declares that "[a] personal firearm, a firearm accessory, or ammunition that is manufactured commercially or privately in Montana and that remains within the borders of Montana is not subject to federal law or federal regulation, including registration, under the authority of congress

[sic] to regulate interstate commerce."  Mont. Code Ann. § 30-20-104.

In the months preceding the Act's effective date, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") received a number of inquiries from firearms industry members as to the potential effects of Montana's new law on their business activities.  Dkt. 33-2.  In light of those inquiries, the ATF authored a July 16, 2009, open letter to all Montana Federal Firearms Licensees for the purpose of providing guidance regarding their continuing obligations under federal law.  Dkt. 33-2.  The ATF explained that "because the Act conflicts with Federal firearms laws and regulations, Federal law supersedes the Act, and all provisions of the Gun Control Act and the National Firearms Act, and their corresponding regulations, continue to apply."  Dkt. 33-2.  The ATF indicated that any Federal requirements and prohibitions would "apply whether or not the firearms or ammunition have crossed state lines."  Dkt. 33-2, at 2.

In August 2009, Plaintiff Gary Marbut wrote to the resident agent in charge of the ATF field office in Billings, Montana, seeking similar guidance.  Marbut indicated  that he wanted to manufacture firearms, firearms accessories, or ammunition consistent with the Act and asked whether it would be permissible under federal law for him to do so.   Dkt. 33-1.  The ATF responded by letter on September 29, 2009, identifying various requirements under federal firearms laws.

Dkt. 33-1.  The ATF cautioned Marbut that a violation of the Gun Control Act or

the National Firearms Act "could lead to...potential criminal prosecution."   Dkt.

33-1.  In closing, the ATF stated once again that  to the extent "the Montana

Firearms Freedom Act conflicts with Federal firearms laws and regulations,

Federal law supersedes the Act, and all provisions of the [Gun Control Act] and

[National Firearms Act], and their corresponding regulations, continue to apply."

Dkt. 33-1.

Unsatisfied with that response, Marbut commenced this declaratory

judgment action on October 1, 2009, along with fellow Plaintiffs the Montana

Shooting Sports Association[1] and the Second Amendment Foundation.[2]   Dkt. 1.

Plaintiffs have amended their complaint twice since then, most recently on April 9,

2010.[3]  Dkt. 6, 33.  Plaintiffs explain that Marbut and other individuals want to be

---

[1] Gary Marbut is the president of the Montana Shooting Sports Association,
which is a non-profit corporation organized for the purpose of supporting and
promoting firearm use and safety, as well as educating its members on their
constitutional right to keep and bear arms.  Dkt. 33, at 2-3.

[2] The Second Amendment Foundation is a State of Washington non-profit
organization with members nationwide, similarly dedicated to promoting the
constitutional right to keep and bear firearms.

[3] Plaintiffs amended their Complaint once as a matter of course on
December 14, 2009.  See Fed. R. Civ. P. 15(a)(1).   After the United States moved
to dismiss,  Plaintiffs filed a Second Amended Complaint primarily to bolster their
allegations relating to the questions of standing and final agency action.  Dkt. 33.
As the United States notes, however, Plaintiffs filed their Second Amended
Complaint without first obtaining the opposing party's written consent or leave of

able to manufacture and sell small arms and small arms ammunition to customers

in Montana pursuant to the Act without complying with the National Firearms Act,

the Gun Control Act of 1968, or any other applicable federal laws.  Dkt. 33, at 7-8.

According to Marbut, he "has hundreds of customers who have offered to pay his

stated asking price for both firearms and firearms ammunition manufactured under

the [Act]," but those sales "are all specifically conditioned on the [firearms] being

manufactured pursuant to the [Act], without [National Firearms Act] or [Gun

Control Act] licensing, or as the customers see it, [ATF] interference."  Dkt. 33, ¶

15.

      Citing the ATF's September 29, 2009 letter, however, Plaintiffs maintain

the ATF has made clear that "no Montanan who wishes to proceed under the [Act]

can do so without  becoming licensed by [ATF], and without fear of federal

criminal prosecution and/or civil sanctions...."  Dkt. 33, ¶ 16.  This presents a

potential problem for the Plaintiffs, who indicate they do not want to pay the

requisite ATF licensing fees and taxes, and do not want to submit to National

---

court as required by Fed. R. Civ. P. 15(a).  Dkt. 70, at 11 n.2.  Nevertheless, the
United States has not moved to strike the Second Amended Complaint and has had
the opportunity to address Plaintiffs' newly amended pleading in its reply brief
and at oral argument.  Accordingly, and  bearing in mind that leave to amend shall
be freely given under Fed. R. Civ. P. 15(a)(2), the Court will consider Plaintiffs'
Second Amended Complaint as the operative pleading from this point forth.   Dkt.
33.

Firearms Act or Gun Control Act licensing and registration procedures, record keeping requirements, and marking mandates.  Dkt. 33, ¶ 16.  Plaintiffs allege that the threat of federal criminal prosecution and/or civil action is effectively preventing them "and all law abiding citizens from exercising their rights under and otherwise benefitting from the" Act.  Dkt. 33, ¶ 22.

Plaintiffs bring this action for declaratory and injunctive relief in an effort to have those rights adjudicated.  They ask the Court to declare that: (1) the United States Constitution confers no power on Congress to regulate the special rights and activities contemplated by the Act; (2) under the Ninth and Tenth Amendments of the United States Constitution, all regulatory authority of all such activities within Montana's political borders is left in the sole discretion of the State of Montana; and (3) federal law does not preempt the Act and cannot be invoked to regulate or prosecute Montana citizens acting in compliance with the Act.  Dkt. 33, at 14.  Plaintiffs also seek injunctive relief to that effect, asking that the Court permanently enjoin the United States "and any agency of the United States of America from prosecuting any civil action, criminal indictment or information under the [National Firearms Act] or the [Gun Control  Act], or any other federal laws and regulations, against Plaintiffs or other Montana citizens acting solely within the political borders of the State of Montana in compliance

with the [Act]." Dkt. 33, at 14.

The United States has moved under Federal Rule of Civil Procedure 12(b) to dismiss this entire action for lack of standing, lack of subject matter jurisdiction, and failure to state a claim upon which relief may be granted.   After the United States filed its motion, the State of Montana intervened as of right in this matter and submitted a brief in support of the Act.  Dkt. 46, 47.  Also contributing to the current discussion are the several amici curiae who have filed briefs in support of either the Plaintiffs or the United States.[4]

Having reviewed the briefs and materials of record, and having heard oral argument on July 15, 2010, the Court turns now to the  question of whether Plaintiffs' Second Amended Complaint is sufficient to withstand the United States' motion to dismiss.

## II.    Legal Standards - Motion to Dismiss

### A.  Rule 12(b)(1)

---

[4] The following Amici have appeared in support of the Plaintiffs: Goldwater Institute Scharf-Norton Center for Constitutional Government, *et al.*; Weapons Collectors Society of Montana; the States of Utah and other States; several members of the Montana Legislature; the Paragon Foundation; the Center for Constitutional Jurisprudence and several state lawmakers from seventeen states; and the Gun Owners Foundation *et al.*

The following Amici have appeared in support of the United States: The Brady Center to Prevent Gun Violence *et al.*

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over the claims asserted.   "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coalition v. United States Environmental Protection Agency*, 509 F.3d 1095, 1102 n. 1 (9th Cir. 2007).

A defendant may pursue a Rule 12(b)(1) motion to dismiss for lack of jurisdiction either as a facial challenge to the allegations of a pleading, or as a substantive challenge to the facts underlying the allegations. *Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  A facial challenge to the jurisdictional allegations is one which contends that the allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The success of a facial challenge to jurisdiction depends on the allegations in the complaint, and does not involve the resolution of a factual dispute. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  In a facial challenge the court must assume the allegations in the complaint are true and it must "draw all reasonable inferences in [plaintiff's] favor." *Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe*

*Air for Everyone*, 373 F.3d at 1039.  In resolving such a factual attack, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Safe Air for Everyone*, 373 F.3d at 1039.  If the moving party has "converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  *Safe Air for Everyone*, 373 F.3d at 1039 (*quoting Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003)).  In looking to matters outside the pleadings, the Court must "resolve all disputes of fact in favor of the non-movant...similar to the summary judgment standard."  *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996).  As with a motion for summary judgment, the party moving to dismiss for lack of subject matter jurisdiction "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

### B.  Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Black*, 250 F.3d 729, 732 (9th Cir.

2001).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint

lacks a cognizable legal theory or sufficient facts to support a cognizable legal

theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.

2008).

To survive a Rule 12(b)(6)  motion, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that the plaintiff

must plead "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

While the court must accept all factual allegations in the complaint as true

and construe them in the light most favorable to the plaintiffs, it is "not bound to

accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550

U.S. at 555.  "Nor is the court required to accept as true allegations that are merely

conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

*Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Assessing a claim's plausibility is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129

S.Ct. at 1950.

## III.   Discussion

The United States argues that this declaratory judgment action should be dismissed for lack of subject matter jurisdiction because Plaintiffs have not established a waiver of sovereign immunity under the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and have not demonstrated that they are entitled to non-statutory review of a non-final agency action.  The United States also maintains that subject matter jurisdiction is lacking because Plaintiffs have not shown an economic injury or credible threat of imminent prosecution sufficient to confer standing for purposes of pursuing their pre-enforcement constitutional challenge.  Even if the Court does have subject matter jurisdiction, the United States argues that Plaintiffs have failed to state a claim upon which relief may be granted under binding United States Supreme Court and Ninth Circuit precedent.

### A.   Sovereign Immunity

"Federal courts are courts of limited jurisdiction," having the power to hear cases only as authorized by the Constitution and by Congress.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Pursuant to 28 U.S.C. § 1331, Congress has authorized the federal courts to exercise federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  Plaintiffs have invoked this jurisdictional provision, and ask the Court to

answer such federal questions as whether the United States Constitution gives

Congress the power to regulate the intrastate firearms commerce activities

contemplated by the Act.  Dkt. 33, at 4 & 14.  While Plaintiffs' lawsuit can thus be

said to arise under federal law for § 1331 purposes, the United States nevertheless

argues the Court is without subject matter jurisdiction because the government has

not waived its sovereign immunity.

The doctrine of sovereign immunity operates as "an important limitation on

the subject matter jurisdiction of federal courts."  *Dunn & Black, P.S. v. U.S.*, 492

F.3d 1084, 1087 (9th Cir. 2007) (*quoting Vacek v. U.S. Postal Service*, 447  F.3d

1248, 1250 (9th Cir. 2006)).  As a sovereign, the United States "is immune from

suit unless it has expressly waived such immunity and consented to be sued."

*Dunn & Black*, 492 F.3d at 1087-88 (*quoting Gilbert v. DaGrossa*, 756 F.2d 1455,

1458 (9th Cir. 1985)).  Absent an unequivocally expressed waiver, there is no

federal court jurisdiction.  *Dunn & Black*, 492 F.3d at 1088.

Plaintiffs bear the burden of showing that the United States has waived its

sovereign immunity.  *Cato v. United States*, 70 F.3d 1103, 1107 (9th Cir. 1995).

Citing the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq.,

Plaintiffs allege the United States has unequivocally waived its immunity with

respect to their claims.   Dkt. 33, ¶ 7.  Section 702 of the APA indeed waives

sovereign immunity for certain nonmonetary claims against the United States,

providing as it does that

> [a]n action in a court of the United States seeking relief other than money
> damages and stating a claim that an agency...acted or failed to act...shall not
> be dismissed nor relief therein be denied on the ground that it is against the
> United States or that the United States is an indispensable party.

5 U.S.C. § 702.

As with any waiver of sovereign immunity, however, the waiver set forth in

§ 702 is to be strictly construed in favor of the United States.  *See e.g. Dunn &*

*Black*, 492 F.3d at 1088; *Vacek*, 477 F.3d at 1250.  Consistent with this principle,

the United States argues that § 702 does not provide a waiver of sovereign

immunity in this case because judicial review under the APA is limited to final

agency action, and there has been no such final decision here.[5]

The APA provides the procedural mechanism by which "[a] person

suffering legal wrong because of agency action, or adversely affected or aggrieved

by agency action within the meaning of a relevant statute," may obtain "judicial

review thereof."  5 U.S.C. § 702.  By its terms, the APA limits this right of judicial

review to "final agency action for which there is no other adequate remedy in a

---

[5] This amounts to a factual attack on jurisdiction, whereby the United States
challenges the Plaintiffs' allegations regarding final agency action.  Because the
United States has mounted a factual attack, the Court may look to matters outside
the pleadings for purposes of resolving the motion.

court."[6]  5 U.S.C. § 704.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871,

882 (1990).  In other words, the APA provides for judicial review of agency

action, but only if that action is final.  *See Lujan*, 497 U.S. at 882; *Rattlesnake*

*Coalition v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007).

Plaintiffs allege that the ATF's September 29, 2009, letter to Marbut

constituted "final agency action" within the meaning of the APA.  Dkt. 33, ¶¶ 14-

16.  The ATF wrote the letter in response to an inquiry from Marbut as to whether

it would be permissible under federal law for him to engage in the firearms

manufacturing activities authorized by the Act.  Dkt. 33-1.  The ATF's letter

explained that the manufacture of certain firearms, even for personal use, would

require ATF approval, and advised Marbut that "[t]he manufacture of firearms or

ammunition for sale to others in Montana requires licensure by [the] ATF."  Dkt.

33-1.  The ATF cautioned Marbut "that any unlicensed manufacturing of firearms

or ammunition for sale or resale, or the manufacture of any [National Firearms

Act] weapons, including sound suppressors, without proper registration and

payment of tax, is a violation of Federal law and could lead to the forfeiture of

such items and potential criminal prosecution under the [Gun Control Act] or the

_____

[6] The APA also provides for judicial review of an "[a]gency action made
reviewable by statute."  5 U.S.C. § 704.  Because neither party points to any
agency action made reviewable by statute, this provision is not implicated here.

[National Firearms Act].” Dkt. 33-1.  In closing, the ATF stated that to the extent

“the Montana Firearms Freedom Act conflicts with Federal firearms laws and

regulations, Federal law supersedes the Act, and all provisions of the [Gun Control

Act] and [National Firearms Act], and their corresponding regulations, continue to

apply.” Dkt. 33-1.

For an agency action like this letter to be considered final for purposes of

the APA, it must satisfy the following two criteria: (1) “the action must mark the

consummation of the agency’s decisionmaking process – it must not be of a

merely tentative or interlocutory nature;” and (2) “the action must be one by which

rights or obligations have been determined, or from which legal consequences will

flow.” *Bennett v. Spear,* 520 U.S.  154, 177-78 (1997) (internal citations and

quotation marks omitted).  “The core question is whether the agency has

completed its decisionmaking process, and whether the result of that process is

one that will directly affect the parties.” *Oregon Natural Desert Association v.*

*United States Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006) (citation and

quotation omitted).

The ATF’s letter to Marbut does not satisfy either of the *Bennett* criteria.

With respect to the first requirement, there is nothing to suggest that the letter

marks the consummation of the ATF’s decisionmaking process.  In fact, there is

nothing to suggest that the ATF engaged in any decisionmaking process at all.

The letter simply restates the requirements of federal firearms laws and reiterates

well-established principles of federal supremacy and conflict preemption. *See*

*Golden and Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432 (4th Cir. 2010)

(concluding "there was simply no decisionmaking process" involved in the

publication of an ATF reference guide that did nothing more than restate the

requirements of federal firearms laws in response to frequently asked questions) .

Even assuming the letter did somehow mark the consummation of the

ATF's decisionmaking process, it does not satisfy the second prong of the *Bennett*

finality test, which requires that the agency's action "be one by which rights or

obligations have been determined, or from which legal consequences will flow."

*Bennett*, 520 U.S. at 178 (internal quotations omitted).  In other words, the specific

action challenged must have some "legal effect."  *Oregon Natural Desert*

*Association v. United States Forest Service*, 465 F.3d 977, 987 (9th Cir. 2006).  In

determining whether an agency action satisfies this second *Bennett* criteria, the

court may properly consider whether the action "has a direct and immediate effect

on the day-to-day business of the subject party," whether it "has the status of law

or comparable legal force, and whether immediate compliance with its terms is

expected."  *Oregon Natural Desert Association*, 465 F.3d at 987.

The ATF's letter to Marbut did not have any such legal effect.  The letter did not impose any new obligations on Marbut, deny him a right, or otherwise fix some legal relationship.  The letter simply restated Marbut's obligations under longstanding federal firearms laws.  Even if the ATF had not written the letter, Marbut would still have been required to comply with those federal firearms laws.  In other words, any legal consequences in this case emanate not from the ATF's letter, but from applicable federal firearms laws and their implementing regulations.  *See Golden and Zimmerman*, 599 F.3d at 433.

At oral argument, Plaintiffs maintained that the ATF's letter did more than just  restate Marbut's obligations under  federal firearms laws.   According to Plaintiffs, the letter had the legal effect of clarifying Marbut's obligations under those federal laws in light of Montana's newly passed Firearms Freedom Act.  The ATF did advise Marbut that "[t]o the extent that the Montana Firearms Freedom Act conflicts with Federal firearms laws and regulations, Federal law supersedes the Act, and all provisions of the [Gun Control Act] and [National Firearms Act], and their corresponding regulations, continue to apply."  Dkt. 33-1.  But because that statement did nothing to in any way alter Marbut's pre-existing obligations under those federal firearms laws, it was of no concrete legal effect.  Because the ATF's letter did not impose any obligation, deny a right, or have any

legal effect on Marbut, the letter does not satisfy the second *Bennett* criteria for final agency action.

Even assuming they cannot show the requisite final agency action, Plaintiffs argue they are entitled to relief under the narrow doctrine of non-statutory review. "The basic premise behind non-statutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is ultra vires." *Rhode Island Dept. of Environmental Management v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). A plaintiff requesting non-statutory review of a non-final decision must show that the agency acted "in excess of its delegated powers and contrary to a specific prohibition [that] is clear and mandatory." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

As they articulated it at oral argument, Plaintiffs' theory that the ATF was acting in excess of its delegated powers is inextricably intertwined with the merits of their constitutional challenge. On the merits, Plaintiffs argue that Congress exceeded its powers under the Commerce Clause by enacting federal firearms laws regulating the intrastate firearms activities contemplated by the Act. Assuming the federal firearms laws Congress has charged the ATF with enforcing are unconstitutional, Plaintiffs maintain that any actions taken by the ATF to enforce

those unconstitutional laws can only be considered ultra vires.[7]  This argument is

inescapably circular.  Under Plaintiffs' approach, the Court would not be able to

determine the threshold jurisdictional question of whether Plaintiffs are entitled to

non-statutory review without first conducting that review and addressing the

merits of their constitutional claims.

It is this Catch-22 that best illustrates why Plaintiffs' argument regarding

non-statutory review of non-final agency action is misplaced.  Plaintiffs first

developed this argument in response to the United States' motion to dismiss,

which understandably characterized Plaintiffs' action as one brought for judicial

review of a final agency action under the APA.  Plaintiffs' First Amended

Complaint, which was the operative pleading when the United States filed its

motion to dismiss, alleged jurisdiction "based generally on § 704," which provides

for judicial review of final agency action, but said nothing about an alleged waiver

of sovereign immunity or anything further about an alleged final agency action.

Dkt. 6, ¶ 6.  Presumably construing Plaintiffs' jurisdictional allegation as a request

for judicial review under the APA, the United States moved to dismiss on the

_____

[7] Plaintiffs have not cited any authority for the proposition that such conduct
is properly described as "ultra vires."  Nevertheless, there is authority to support
the general notion that sovereign immunity does not bar an action for judicial
review of an agency decision where a government officer acts "pursuant to an
unconstitutional grant of power from the sovereign."  *State of Alaska v. Babbitt*,
38 F.3d 1068, 1076 (9th Cir. 1994).

ground that it had not waived its sovereign immunity under § 702, because there was no final agency action. After the United States filed its motion to dismiss, Plaintiffs amended their complaint a second time to specifically allege a waiver of sovereign immunity under § 702, and that the ATF's September 29, 2009, letter to Marbut constituted "final agency action" within the meaning of the APA. Dkt. 33, ¶¶ 7, 14-16.

As discussed above, however, the ATF's September 29, 2009, letter does not constitute final agency action within the meaning of the APA. Consequently, Plaintiffs are not entitled to judicial review under the APA. This does not mean, however, that Plaintiffs' entire lawsuit should be dismissed on that basis alone, as the United States suggests.

Plaintiffs' lawsuit is not simply one for judicial review of agency action under the APA. Rather, the suit seeks declaratory and injunctive relief to prevent the United States from enforcing what Plaintiffs allege are unconstitutional federal firearms laws.[8] For example, Plaintiffs' Second Amended Complaint asks the

---

[8] As noted above, while Plaintiffs' first two complaints alleged jurisdiction based on § 704 of the APA, they contained no allegations of final agency action and did not specifically allege a waiver of sovereign immunity. *See* Dkt. 1 & 6. It may well be that Plaintiffs simply intended to rely on the waiver of sovereign immunity set forth in § 702 of the APA for purposes of pursuing their constitutional challenge, over which the Court would have federal question subject matter jurisdiction.

Court to declare that the United States Constitution confers no power on Congress to regulate the special rights and activities contemplated by the Act.  Dkt. 33, at 14.  The Second Amended Complaint also seeks injunctive relief enjoining the United States "and any agency of the United States of America from prosecuting any civil action, criminal indictment or information under the [National Firearms Act] or the [Gun Control Act], or any other federal laws and regulations, against Plaintiffs or other Montana citizens acting solely with the political borders of the States of Montana in compliance with the [Act]."  Dkt. 33, at 14.

These claims fall within a well-established exception to the doctrine of sovereign immunity.  Federal courts have long recognized that the doctrine of sovereign immunity is inapplicable "in declaratory and/or injunctive relief suits against federal entities or officials seeking to enjoin the enforcement of an unconstitutional statute."  *Kelley v. United States*, 69 F.3d 1503, 1507 (10th Cir. 1995).  *See also Entertainment Network, Inc. v. Lappin*, 134 F.Supp.2d 1002, 1009 (S.D. Ind. 2001); *Tenneco Oil Co. v. Sac and Fox Tribe*, 725 F.2d 572, 574 (10th Cir. 1984) (claim that law is unconstitutional falls within exception to doctrine of sovereign immunity).  As the United States Supreme Court once explained it, the doctrine does not apply in such cases because "the conduct against which specific relief is sought is beyond the officer's power and is, therefore, not the conduct of

the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682,

690 (1949).  Consequently, there is an exception to sovereign immunity in a suit

for declaratory and/or injunctive relief against federal officials where the plaintiff

"alleges that the statute conferring power upon the officers is unconstitutional."

*Kozero v. Spirito*, 723 F.2d 1003, 1008 (1ˢᵗ Cir. 1983).  *See also Clinton v. Babbitt*,

180 F.3d 1081, 1087 (9ᵗʰ Cir. 1999).  "Any other rule would mean that a claim of

sovereign immunity would protect a sovereign in the exercise of power it did not

possess."  *Kelley*, 69 F.3d at 1507 (quoting *Tenneco Oil Co.*, 725 F.2d at 574).[9]

    Because the doctrine of sovereign immunity does not apply to Plaintiffs'

claims for declaratory and injunctive relief to prevent the United States from

enforcing allegedly unconstitutional federal firearms laws, it would not be

appropriate to dismiss this entire case based on Plaintiffs' failure to establish a

valid waiver.   Of course, Plaintiffs must still demonstrate that they have standing

under Article III of the United States Constitution to pursue their pre-enforcement

challenge.  This brings the Court to the United States' next argument, which is that

_____

    [9] Many courts have essentially read the APA's waiver of sovereign
immunity for nonmonetary actions against the United States as a codification of
that common law rule.  *See e.g. Chamber of Commerce of U.S. v. Reich*, 74 F.3d
1322, 1329 (D.C. Cir. 1996).  This may well be why Plaintiffs cited the APA in
the first instance.  As noted above, however, they alleged jurisdiction based on §
704 of the APA, and did not allege a waiver of sovereign immunity under § 702
until after their lawsuit had been understandably construed as one seeking judicial
review under § 704.

Plaintiffs' pre-enforcement challenge should be dismissed for lack of subject

matter jurisdiction based on lack of standing.

> **B.     Standing**

The United States argues that subject matter jurisdiction is lacking in this

case because Plaintiffs have not shown an economic injury or credible threat of

imminent prosecution sufficient to confer standing.[10]

Article III of the United States Constitution "limits the jurisdiction of

federal courts to 'cases' and 'controversies.'" *San Diego County Gun Rights

Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).  Standing is an "essential

and unchanging part" of this case-or-controversy requirement. *Wolfson v.

Brammer*, 2010 WL 3191159 * 5 (9th Cir. 2010).  As the party invoking federal

jurisdiction, a plaintiff bears the burden of establishing standing to sue. *San Diego

County*, 98 F.3d at 1126.

At an "irreducible constitutional minimum," Article III standing requires

proof  "(1) that the plaintiff suffered an injury in fact that is 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) of a

_____

[10]  The United States' motion to dismiss for lack of standing constitutes a
factual challenge to the  subject matter jurisdiction of this Court.  To determine
whether Plaintiffs have established standing based on economic injury or threat of
prosecution, the Court properly looks outside the pleadings to the other materials
of record.

causal connection between the injury and the complained-of conduct; and (3) that a favorable decision will likely redress the alleged injury."[11]   *Alaska Right to Life Political Action Committee v. Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  And where, as here, "plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm."  *San Diego County*, 98 F.3d at 1126.  The United States maintains that Plaintiffs cannot make it over the threshold hurdle of establishing that they have suffered an injury in fact for purposes of satisfying the first element of Article III standing.

Plaintiffs claim to have suffered two types of injury sufficient to confer standing.[12]  First, Plaintiffs maintain that as a result of the ATF's September 29, 2009 letter, they face an imminent and credible threat of prosecution under Federal firearms laws .  Second, Plaintiffs allege economic injury because the United

---

[11]  The doctrine of prudential standing "supplements the requirement of Article 3 constitutional standing" and may require that the Court consider a number of other factors when assessing standing.  *Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F.3d 886, 891 (9th Cir. 2007).  Because Plaintiffs lack Article III standing for the reasons set forth below, those prudential concerns are not implicated here.

[12]  As briefed, Plaintiffs collectively claim to have standing.   As the ensuing discussion reflects, however, their arguments regarding threat of prosecution and economic standing pertain solely to Marbut. Thus, for purposes analyzing these two issues, the Court will refer only to Marbut.  The Court will address the standing of the two organizational plaintiffs separately.

States has effectively prevented them from manufacturing firearms under the Act and in turn selling those firearms to prospective customers.  The Court will address each of these alleged injuries in turn.

### 1.  Threat of prosecution

Marbut's claims for declaratory and injunctive relief are, in substance, a pre-enforcement challenge to the Federal firearms laws they maintain are unconstitutional. To demonstrate an injury in fact when bringing such a pre-enforcement challenge, a plaintiff must show that "there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  This does not mean that a plaintiff must go so far as to "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Babbitt*, 442 U.S. at 298.  *See also Holder v. Humanitarian Law Project*, \_ U.S.\_, 2010 WL 2471055 *11 (2010).  By the same token, however, "the mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *San Diego County,* 98 F.3d at 1126 (citation and quotations omitted).  A plaintiff is thus tasked with showing that he faces a "genuine threat of imminent prosecution." *San Diego County*, 98 F.3d at 1126.

When evaluating the credibility of a threat of prosecution in any given case,

the court is to consider (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute."[13] *Thomas v. Anchorage Equal Rights Comm'n.*, 220 F.3d 1134, 1139 (9th Cir. 2000). Assuming Marbut could establish – which he most likely would – a history of Federal government enforcement of the various mandates of the National Firearms Act and Gun Control Act, he has failed to show the remaining two factors.

a.      *Concrete plan to violate federal law*

To demonstrate a concrete plan, a plaintiff must point to "something more than a hypothetical intent to violate the law." *Thomas*, 220 F.3d at 1139. "A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Thomas*, 220 F.3d at 1139. "Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

---

[13] This test "coincides squarely with" the ripeness inquiry. *Thomas*, 220 F.3d at 1138. Regardless of whether the jurisdictional inquiry is framed "as one of standing or of ripeness, the analysis is the same." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003).

Furthermore, if  "[t]he acts necessary to make plaintiffs' injury –

prosecution under the challenged statute – materialize are almost entirely within

plaintiffs' own control," then the "high degree of immediacy" necessary for

purposes of establishing standing is not present.  *San Diego County,* 98 F.3d at

1127.  Thus, plaintiffs who merely "wish and intend to engage in activities

prohibited" by existing law cannot be said to have articulated a concrete plan to

violate the law.  *San Diego County,* 98 F.3d at 1127.

While Marbut would clearly like to manufacture firearms in accordance

with the Act,  that is not sufficient for purposes of articulating a concrete plan to

violate the law.  *San Diego County,* 98 F.3d at 1127.   Marbut claims he has the

means to manufacture a .22 caliber rifle he proposes to call the Montana

Buckaroo, and has presented some evidence in an attempt to establish that this is

so, but he has correspondingly indicated that he has no concrete plans to

manufacture those firearms if doing so means he will be in violation of federal

law.  In February 2010, for example, Marbut sent an email to members of the

Montana Shooting Sports Association, soliciting customers for his "not-yet-

available" Montana Buckaroo.  Dkt. 86-18 at 1.  Marbut advised the prospective

customers that he "may only make these" rifles "IF we win the lawsuit, and IF I

can actually produce them."  Dkt. 86-18, at 1.  Thus, while Marbut states in his

sworn declaration that he "wishes to pursue this commercial activity," he  has not expressed any intent to actually do so in violation of the federal firearms laws he claims are unconstitutional.

Whether Marbut will ever face prosecution under Federal firearms law is at this point almost entirely within his own control, depending in the first instance on whether he decides to manufacture firearms in accordance with the Act.  Because the acts necessary to make Marbut's injury materialize are almost entirely within his control," the "high degree of immediacy" necessary for purposes of establishing standing is lacking.  *San Diego County,* 98 F.3d at 1127.

Because Marbut has not "articulated a 'concrete plan' to violate the law in question," he cannot show that he faces a credible, genuine threat of imminent prosecution. *Thomas,* 220 F.3d at 1139.   Even if the Court were to conclude otherwise and find that Marbut had articulated sufficiently concrete plans to violate the Federal firearms laws in question, he has not shown  that he faces a specific threat of prosecution.

> b.   *Specificity of threat*

To establish standing based on the threat of prosecution, Marbut must show that the federal firearms laws at issue are "actually being enforced" against him. *San Diego County*, 98 F.3d at 1127.  Under this standard, "a general threat of

prosecution is not enough to confer standing." *San Diego County*, 98 F.3d at

1127.  Marbut must instead show "[a] specific warning of an intent to prosecute

under a criminal statute..." *San Diego County*, 98 F.3d at 1127.   This entails

showing something more than a general assertion by prosecuting officials that they

intend to enforce particular laws.  *See e.g. Poe v. Ullman*, 367 U.S. 497, 499

(1961); *Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 5-6

(9th Cir. 1974)   Such general assertions lack the "immediacy" necessary to give

rise to a justiciable controversy.  *Poe*, 367 U.S. at 501.

Marbut argues that a specific threat of prosecution can be found in the

ATF's September 29, 2009, letter.   As noted above, however, the ATF simply

identified various requirements under current federal firearms laws, and cautioned

Marbut "that any unlicensed manufacturing of firearms or ammunition for sale or

resale, or the manufacture of any [National Firearms Act] weapons, including

sound suppressors, without proper registration and payment of tax, is a violation

of Federal law and could lead to the forfeiture of such items and potential

prosecution under the [Gun Control Act] or the [National Firearms Act]."  Dkt. 33-

1.  This statement amounts to nothing more than a general assertion that anyone

who violates the nation's federal firearms statutes may be subject to criminal

prosecution.  Such a general statement is not a specific threat of an imminent

intent to prosecute Marbut as required for purposes of establishing standing.[14]

*See National Rifle Ass'n. v. Magaw*, 132 F.3d 272, 293-94 (6th Cir. 1997)

(concluding that "plaintiffs who telephoned BATF agents, submitted a

hypothetical question, and received an answer that the questioned activity could

subject them to federal prosecution does not confer standing"); *Kegler v. U.S.*

*Dept. Of Justice*, 436 F.Supp.2d 1204, 1212-19 (D. Wyo. 2006); *Crooker v.*

*Magaw*, 41 F.Supp.2d 87, 91- 92 (D. Mass. 1999).   Absent a specific threat of

prosecution, Marbut cannot establish that he has standing to pursue his pre-

enforcement challenge.

　　　When all is said and done, Marbut has not shown that he faces a genuine

threat of imminent prosecution, which in turn means he has not satisfied the injury

in fact requirement for purposes of Article III standing.  While Marbut's threat of

prosecution argument thus fails, he claims in the alternative to have standing based

on economic injury.  *See National Audubon Society, Inc. V. Davis*, 307 F.3d 835,

855 (9th Cir. 2002) (economic injury and threat of prosecution are alternate

theories by which a plaintiff may establish standing)

　　　　　2.  Economic harm

---

[14] To the extent any of the Plaintiffs might argue that the ATF's July 2009 open letter to all Montana federal firearms licensees constitutes a specific threat of prosecution, that argument would fail for the same reasons.  The July 2009 letter was even more general, written as it was for the public at large.

Marbut alleges he has suffered, and will continue to suffer, economic injury because the United States has effectively prevented him from manufacturing firearms under the Act and in turn selling those firearms to prospective customers. Dkt. 33, ¶ 15.

A plaintiff may satisfy the injury-in-fact prong of the constitutional standing analysis by demonstrating economic injury. *Central Arizona Water Conservation Dist. v. United States Environmental Protection Agency*, 990 F.2d 1531, 1537 (9th Cir. 1993). As with any injury that is alleged for purposes of establishing standing, such an economic injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Central Arizona Water*, 990 F.2d at 1537. *See also*, *National Audubon Society*, 307 F.3d at 856 (economic harm must be "actual, discrete, and direct").

Marbut claims to have "suffered past injury in the loss of economic opportunities" since the effective date of the Act because he has not been able to do as he would like, which is to manufacture and sell firearms under the Act without complying with federal firearms laws. Dkt. 51-1, at 8. According to Marbut, the fact that he has "already suffered economic harm" should be "enough [t]o confer standing." Dkt. 51-1, at 8.

Marbut is mistaken for two reasons. First of all, his allegations of past

economic harm amount to nothing more than a hypothetical injury, consisting only of theoretical lost profits from a non-existent business operation.  There is nothing concrete, particularized, or actual about such an alleged economic injury.  Even if Marbut did have some plausible basis upon which he might claim past economic injury, that would not be sufficient to confer standing under the circumstances. Because Marbut is seeking "declaratory and injunctive relief only," he needs to do more than demonstrate past economic injury. *Bras v. California Public Utilities Commission*, 59 F.3d 869, 873 (9th Cir. 1995).   He must instead "show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, (6th Cir. 1997) (*citing Bras*, 59 F.3d at 873).

Marbut does allege that he is suffering ongoing economic harm, and will continue to suffer that economic harm in the future, because the United States is effectively preventing him from manufacturing and selling firearms under the Act "for significant economic gain."   Dkt. 33, ¶ 15.  In an effort to demonstrate that this alleged economic injury is more than just hypothetical and speculative, Marbut has presented evidence of his proposed  plans for manufacturing the Montana Buckaroo.  Dkt. 86-2, ¶ 15; 86-6.  For example, Marbut indicates he has identified third-party commercial entities that can assist him with various aspects

of the manufacturing process, and has solicited a number of prospective customers who will buy the Montana Buckaroo if it becomes available.  Dkt. 86-2, ¶ 15; 86-6, 86-18.   Marbut maintains that the evidence he has presented is sufficient to show that, were it not for the federal firearms laws he claims are unconstitutional, he would be reaping significant financial gain and is therefore suffering an ongoing economic injury.

The Ninth Circuit has long recognized the principle that a plaintiff whose pre-existing business activities are adversely affected by newly enacted legislation or other government action may have standing based on economic injury.   In *National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 856 (9th Cir. 2002), for example, the court held that animal trappers whose commercial trapping activities were prohibited under newly enacted state law had standing based on economic injury to challenge the law.  Similarly, in *Central Arizona,* 990 F.2d at 1537-38, the court held that a water district that was contractually obligated to repay a federal agency for a portion of the cost of complying with a final rule imposed by the Environmental Protection Agency had  standing based on economic injury to challenge the rule.

Unlike the plaintiffs in *National Audubon* and *Central Arizona*, however, Marbut is not now, and has never been, engaged in a commercial activity that is

suffering, or is likely to suffer, any economic harm as a result of the federal firearms laws he is attempting to challenge.  At this point, Marbut is claiming nothing more than hypothetical lost profits from a hypothetical and illegal business enterprise.  As such, the ongoing and future economic harm Marbut claims is far too speculative to constitute an injury in fact for purposes of establishing standing.  *See e.g. Regents of University of California v. Shalala*, 872 F.Supp. 728, 737 (C.D. Cal. 1994) (concluding that "assertions of possible economic injury are too conjectural and hypothetical" to establish an injury in fact); *Abbott Labs v. Gardner*, 387 U.S. 136, 153 (1967) (explaining that "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action"); *Longstreet Delicatessen, fine Wines & Specialty Coffees, L.L.C. v. Jolly*, 2007 WL 2815022 * 18 (E.D. Cal. 2007) (allegations of economic harm are insufficient where plaintiff "has offered no evidence of actual harm suffered other than by potential lost sales).  Regardless of the specificity of Marbut's proposed manufacturing plan, the fact remains that the business is nothing more than a theoretical one, as are the "significant economic gains" he claims he would be realizing if his proposed illegal business was up and running.

Marbut fails to cite any authority for the proposition that a plaintiff who

wishes he could start an illegal business, and would do so but for the fact that the idea he proposes is illegal, can claim to be suffering actual economic harm in the form of unrealized profits for purposes of establishing standing.  While such a plaintiff might be able to establish standing if he proceeded with his plans to the point where he found himself faced with a credible threat of prosecution, that is not the situation here.

Simply put, there is nothing concrete, particularized, actual, or imminent about the economic injury Marbut alleges in this case.   Nor has Marbut shown that he faces a credible threat of imminent prosecution.  Marbut has thus failed to establish an injury in fact for purposes of satisfying the first element of  Article III standing.

### 3.  Organizational Plaintiffs

An organization or association like the Montana Shooting Sports Association or Second Amendment Foundation "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000).   While Marbut is a member of Montana Shooting Sports Association, he has failed to demonstrate that he has standing to bring this action in his own right.  Consequently, the Montana Shooting Sports

Association also lacks standing.  *See Cetacean Community v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (concluding that organization lacked standing where it failed to identify a member who had standing in his or her own right).  Similarly, the Second Amendment Foundation lacks standing because it has not identified any member of its organization that might have standing in his or her own right.

Because Plaintiffs lack constitutional standing, this case should be dismissed for lack of subject matter jurisdiction.  In the event the presiding judge, United States District Court Judge Donald W. Molloy, were to disagree with this recommendation, it would be necessary to turn to the United States' final argument and determine whether Plaintiffs have stated a claim upon which relief may be granted.  In the interest of judicial economy, the Court will address that final argument now and consider whether Plaintiffs' Commerce Clause challenge states a claim upon which relief may be granted in light of controlling United States Supreme Court and Ninth Circuit caselaw.

### C.   Commerce Clause

The operative portion of Montana's Firearms Freedom Act provides, in part, that "[a] personal firearm, a firearm accessory, or ammunition that is manufactured commercially or privately in Montana and that remains within the borders of Montana is not subject to federal law or federal regulation, including registration,

under the authority of congress [sic] to regulate interstate commerce. "  Mont.

Code Ann. § 30-20-104.  The Act expressly declares "that those items have not

traveled in interstate commerce," and by its terms "applies to a firearm, a firearms

accessory, or ammunition that is manufactured in Montana from basic materials

and that can be manufactured without the inclusion of any significant parts

imported from another state."  Mont. Code Ann. § 30-20-104.  The Act excepts

certain firearms from its protective scope, such as those "that cannot be carried

and used by one person," and requires that "[a] firearm manufactured or sold in

Montana under this part must have the words 'Made in Montana' clearly stamped

on a central metallic part, such as the receiver or frame."  Mont. Code Ann. §§ 30-

20-105, 106.

     To that end, the Act includes several '[l]egislative declarations of

authority," which specify that the Montana Legislature's authority to promulgate

such a statutory scheme comes from the Second, Ninth, and Tenth Amendments to

the United States Constitution, and from that portion of the Montana Constitution

guaranteeing the citizens of this state the right to bear arms.  Mont. Code Ann. §

30-20-102.  These legislative declarations state, for example, that "[t]he regulation

of intrastate commerce is vested in the states under the 9th and 10th amendments to

the United States constitution, particularly if not expressly preempted by federal

law," and note that "Congress has not expressly preempted state regulation of

intrastate commerce pertaining to the manufacture on an intrastate basis of

firearms, firearms accessories, and ammunition."  Mont. Code Ann. § 30-20-

102(3).  Intervenor State of Montana ("State of Montana") emphasizes that the

Montana Legislature, in its normal deliberative manner, enacted the Act as

"principally a political statement...setting forth its conception of the interplay

between the powers granted to Congress by the Commerce Clause and the powers

retained by the states and the people pursuant to the Tenth Amendment."  Dkt. 47,

at 5.  Consistent with the Montana Legislature's reading of the United States

Constitution, Plaintiffs ask the Court to declare, among other things, that Congress

does not have the power "to regulate the special rights and activities contemplated

by the [Act]."  Dkt. 33, at 14.

       As the nature of Plaintiffs' request for declaratory relief reflects, the central

question in this case is whether Congress has the power to regulate those activities

the Act purportedly exempts from federal law, namely, the intrastate manufacture

and sale of firearms, firearms accessories, and ammunition.  Article I, § 8 of the

United States Constitution enumerates the powers granted to Congress, including

the power "[t]o regulate Commerce...among the several States" and to "[t]o make

all Laws which shall be necessary and proper for carrying [that power] into

Execution." The United States Supreme Court has long held that the Commerce

Clause vests Congress with the authority to regulate three types of economic

activity: (1) "the use of the channels of interstate commerce," (2) "the

instrumentalities of interstate commerce" and (3) "those activities having a

substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549,

558-59 (1995). *See also Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *United

States v. Stewart*, 451 F.3d 1071, 1073 (9th Cir. 2006).

Because the Act purports to exempt only the intrastate manufacture and sale

of firearms, ammunition, and accessories from federal regulation, the first two

categories of economic activity are not implicated here. This means that whether

Congress has the power to regulate the intrastate activity contemplated by the Act

is properly analyzed under the third and final *Lopez* category. To fall within

Congress' Commerce Clause power on this basis, "the regulated activity must

substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59.

Applying this standard, the United States Supreme Court has repeatedly

held that even purely local activities are subject to the regulatory powers of

Congress if those activities "are part of an economic 'class of activities' that have

a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17

(2005). In *Raich*, the Supreme Court considered whether Congress could, in the

exercise of its powers under the Commerce Clause, apply the Controlled

Substances Act to prohibit the purely local production and medical use of

marijuana authorized by state law. *Raich*, 545 U.S. at 5-8.

The Court answered this question in the affirmative, holding that the

Controlled Substances Act constituted a valid exercise of federal commerce power

even as applied to the purely local activity at issue. *Raich,* 545 U.S. at 9.

Harkening back to its decision in *Wickard v. Filburn*, 317 U.S. 111 (1942), the

*Raich* majority reiterated that "Congress can regulate purely intrastate activity"

even if that activity is not itself commercial, "if it concludes that failure to regulate

that class of activity would undercut the regulation of the interstate market in that

commodity." *Raich*, 545 U.S. at 18.   The  Court explained that it was not required

to determine whether the local "activities, taken in the aggregate, substantially

affect[ed] interstate commerce in fact, but only whether a 'rational basis' exist[ed]

for so concluding."[15]  *Raich*, 545 U.S. at 22.

_____

[15]  The *Raich* Court thus looked to the rational basis standard for purposes of determining whether Congress had acted within its Commerce Clause powers.  At oral argument, Plaintiffs cited the  United States Supreme Court's recent decision in *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020 (U.S. 2010) and argued that federal firearms laws should be subjected to strict scrutiny because they regulate what has now been classified as an individual's fundamental right to possess a handgun in the home for the purpose of self defense.   As discussed below, however, Plaintiffs have not pled a Second Amendment claim in this case.  Nor have Plaintiffs established that they have a fundamental  Second Amendment right to manufacture and sell firearms.  For these reasons *McDonald* is inapposite.

As the *Raich* Court discussed at some length, the Controlled Substances Act provided a "comprehensive framework for regulating the production, distribution, and possession" of the controlled substances, including marijuana. *Raich*, 545 U.S. at 24. Citing "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere," along with "concerns about diversion into illicit channels," the Court had "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacturing and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." *Raich*, 545 U.S. at 22. In doing so, the Court emphasized the fact that the regulatory scheme "ensnares some purely intrastate activity is of no moment." *Raich*, 545 U.S. at 22.

In the end, the Court rejected Raich's attempt to excise individual applications of [the] concededly valid statutory scheme" established by way of the Controlled Substances Act. *Raich*, 545 U.S. at 23. As the Court explained it, "[t]he notion that California law has surgically excised a discrete activity that is hermetically sealed off from the larger interstate marijuana market is a dubious proposition, and, more importantly, one that Congress could have rationally rejected." *Raich*, 545 U.S. at 30. Particularly when "[t]aking into account the fact that California [was] only one of at least nine states to have authorized the medical

use of marijuana," the *Raich* majority found that "Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision [was] unquestionably substantial." *Raich*, 545 U.S. at 32.

Under *Raich*, Montana's attempt to similarly excise a discrete local activity from the comprehensive regulatory framework provided by federal firearms laws cannot stand. As did the federal statute at issue in *Raich*, the federal firearms laws from which Plaintiffs seek to be exempted regulate the production and distribution "of commodities for which there is an established, lucrative interstate market." *Raich*, 454 U.S. at 26. The Ninth Circuit has specifically recognized the corollary between the regulatory framework of the Controlled Substances Act and that provided by federal firearms laws, noting that "[g]uns, like drugs, are regulated by a detailed and comprehensive statutory regime designed to protect individual firearm ownership while supporting 'Federal, State and local law enforcement officials in their fight against crime and violence.'" *United States v. Stewart*, 451 F.3d 1071, 1076 (9th Cir. 2006) (*quoting* Gun Control Act of 1968, Pub. L. No. 90-168, § 101, 82 Stat. 1213, 1213). To that end, the National Firearms Act and Gun Control Act set forth various firearms registration, licensing, record keeping, and marking requirements. *See generally*, 26 U.S.C. § 5801 et seq.; 18 U.S.C. § 921 et

seq.

In Congress' view, the Gun Control Act was necessary to keep firearms "out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States." S. Rep. No. 1097, 90th Cong., 2nd Sess. 1968, 1968 U.S.C.C.A.N. 2112, 2113-2114. Congress found that "[o]nly through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible." *Id.* at 2114.

Here, as in *Raich*, Congress had a rational basis for believing that failure to regulate the intrastate manufacture and sale of firearms, ammunition, and accessories "would leave a gaping hole" in the National Firearms Act and Gun Control Act, thereby undercutting federal regulation of the interstate market in those commodities. *Raich*, 545 U.S. at 18, 22. The size of the "gaping hole" that would be left in the federal regulatory scheme were Montana able to exempt the intrastate activities contemplated by the Act is of particular concern when taking into account the fact that, as of this writing, virtually identical Firearms Freedom

Act legislation has been enacted in six more states and proposed in twenty-two others.  *Raich*, 545 U.S. at 32.  Taking this into account, "Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision is unquestionably substantial." *Raich*, 545 U.S. at 32.

As *Raich* instructs, the fact that federal firearms laws "ensnare some purely intrastate activity," such as the manufacturing and sales activity purportedly exempted from regulation by the Act, "is of no moment."  *Raich*, 545 U.S. at 22. Under *Raich*, the National Firearms Act and Gun Control Act constitute a valid exercise of federal commerce power, even as applied to the purely intrastate manufacture and sale of firearms contemplated by the Act.

That this is so is even more clear in light of the fact that the Ninth Circuit has since applied *Raich* to hold that a statute criminalizing  machine gun possession constitutes a valid exercise of Congressional power under the Commerce Clause, even as applied to purely intrastate activities.  *United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006).  As in *Raich*, the defendant in *Stewart* argued that "his possession [fell] within a subgroup of purely intrastate activities that [could] easily be cordoned off from those Congress may constitutionally control."   *Stewart*, 451 F.3d at 1074.

The Ninth Circuit rejected that argument, noting that "[l]ike the possession regulation in the Controlled Substance Act [at issue in *Raich*], the machine gun possession ban fit[] within a larger scheme for the regulation of interstate commerce in firearms." *Stewart*, 451 F.3d at 1076. Citing *Raich* and *Wickard*, the Court found the fact that the guns had not traveled in interstate commerce was "entirely irrelevant." *Stewart*, 451 F.3d at 1077. Observing that "[t]he market for machineguns [was] established and lucrative, like the market for marijuana," the Court determined there was "a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession [was] essential to effective control of the interstate incident of such traffic." *Stewart*, 451 F.3d at 1077.

Read together, *Stewart* and *Raich* thus "compel the conclusion that Congress' power under the Commerce Clause is almost unlimited where the prohibited product has significant economic value such as with drugs or guns." *United States v. Rothacher*, 442 F.Supp.2d 999, 1007(D. Mont. 2006). Plaintiffs do not disagree, and in an attempt to reverse the course of current Commerce Clause jurisprudence take the novel approach of asking this Court to overrule the United States Supreme Court and Ninth Circuit. Dkt. 51-1, at 18-23.

But this Court is not at liberty to do what Plaintiffs ask. This Court is bound by the decisions of the United States Supreme Court and Ninth Circuit

Court of Appeals.  *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).

"[C]aselaw on point *is* the law," and "[b]inding authority must be followed unless

and until overruled by a body competent to do so."  *Hart*, 266 F.3d at 170.   This

Court is thus bound by *Raich*, and must leave to the United States Supreme Court

"the prerogative of overruling its own decisions."  *Rodriguez de Quijas v.*

*Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).   This Court is

likewise bound to follow existing Ninth Circuit precedent, and could disregard

*Stewart* only if the decision was "clearly irreconcilable" with "intervening higher

authority."  *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003).  That is not the

case here.  *Raich* and *Stewart* remain good law, and control this Court's analysis.

Plaintiffs argue in the alternative that *Raich* is distinguishable, and maintain

that under the circumstances it would be appropriate for this Court to return to the

United States Supreme Court's pre-*Raich* Commerce Clause jurisprudence as set

forth in *United States v. Lopez*, 514 U.S. 549 91995), *United States v. Morrison*,

529 U.S. 598 (2000), and *Jones v. United States*, 529 U.S. 848 (2000).

Particularly in light of the Ninth Circuit's decision in *Stewart*, however, Plaintiffs

attempts to distinguish *Raich* are unavailing.

Plaintiffs first claim that *Raich* is distinguishable because it involved the

market for illegal drugs, and argue its holding should be limited accordingly.  But

there is nothing in *Raich* to suggest that the Court meant for its holding to apply only to commerce in illegal drugs.  Any argument to the contrary is put to rest by *Stewart*, in which the Ninth Circuit likened the regulatory scheme governing interstate commerce in drugs with that governing interstate commerce in firearms and applied *Raich* accordingly.  *Raich*, 451 F.3d at 1076-78.

Plaintiffs also argue that *Raich* should not be viewed as controlling because, unlike the medical marijuana statute at issue there, the Act specifically states that it applies only to intrastate firearms commerce and provides a means for identifying those firearms that come within its protective scope.  By its terms, the Act indeed applies only to those firearms, firearms accessories, and ammunition that are manufactured in Montana and that remain within the borders of this state.  Mont. Code Ann. § 30-20-104.  And as Plaintiffs note, the Act requires that any firearms "manufactured or sold in Montana under this part must have the words 'Made in Montana' clearly stamped on a central metallic part, such as the receiver or frame."  Mont. Code Ann. § 30-20-106.  Presumably, the statute at issue in *Raich* did not similarly specify that it applied only to marijuana grown and used within the state of California, and did not provide a means for distinguishing locally cultivated marijuana from that cultivated elsewhere.  Under the *Raich* Court's analysis, however, neither of these distinctions is material.

Even assuming, as Plaintiffs allege in their Second Amended Complaint, it is possible to have a purely intrastate firearms market,[16] the fact that the Act purports only to exempt activities within that intrastate market from federal regulation is of no consequence. While California's medical marijuana statute might not have specified that it was to be applied only to intrastate activity, that was the only type of activity at issue in *Raich*. As the *Raich* Court framed it, the question presented was whether Congress had authority under the Commerce Clause to "prohibit the local cultivation and use of marijuana in compliance with California law." *Raich*, 545 U.S. at 5. It was undisputed that the marijuana at issue had been cultivated locally for personal use within California and had never entered the stream of interstate commerce. *Raich*, 454 U.S. at 5-7. Upholding the Controlled Substances Act even as applied to that purely local activity, the Court found the fact that the statute's regulatory framework "ensnare[d] some purely intrastate activity [was] of no moment." *Raich*, 545 U.S. at 22.

That the intrastate firearms commerce contemplated by the Act falls within

---

[16] Under *Iqbal*, this Court need not accept as true those allegations that are facially implausible. *Iqbal*, 129 S.Ct. at 1949. This Court is not convinced it is plausible that firearms could be manufactured and sold in Montana without ever thereafter leaving the state. *See e.g. Raich*, 545 U.S. at 30 (finding "[t]he notion that California law has surgically excised a discrete activity that is hermetically sealed off from the larger interstate marijuana market is a dubious proposition....). The Court will nevertheless assume for present purposes that Plaintiffs' allegations are plausible and will proceed on that assumption.

the reach of Congress' Commerce Clause power is even more clear in the wake of the Ninth Circuit's decision in *Stewart*. Applying *Raich*, the *Stewart* court concluded that whether or not the machineguns at issue there had traveled in interstate commerce was "entirely irrelevant." *Stewart*, 451 F.3d at 1077. As the Ninth Circuit summed it up, "when Congress makes an interstate omelet, it is entitled to break a few intrastate eggs." *Stewart*, 451 F.3d at 1075.

The fact that the Act provides a means for distinguishing firearms manufactured in Montana from those manufactured elsewhere does not change matters. As Plaintiffs note, the Act requires that any firearms manufactured or sold under its protective umbrella be clearly stamped with the words "Made in Montana." Mont. Code Ann. § 30-20-106. In Plaintiffs' myopic view, this case is thus different from *Raich,* where there was no such mechanism for distinguishing locally cultivated marijuana in the stream of commerce. The *Raich* Court indeed cited the "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere" as one reason for finding "that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." *Raich*, 545 U.S. at 23. But marijuana's fungibility was only a part of the *Raich* Court's explanation.

The *Raich* Court did not intend for its discussion "of the effect of intrastate marijuana use on national drug prices" to limit Congress' Commerce Clause power "to the sale of fungible goods." *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1276 (11th Cir. 2007). Rather, "the Court's discussion of commodity pricing in *Raich* was part of its explanation of the rational basis Congress had for thinking that regulating home-consumed marijuana was an essential part of its comprehensive regulatory scheme aimed at controlling access to illegal drugs." *Alabama-Tombigbee Rivers Coalition*, 477 F.3d at 1276.

The *Raich* Court also cited "concerns about diversion into illicit channels" – concerns that would remain in this case regardless of whether or not firearms manufactured under the Act bear a "Made in Montana" stamp. *Raich*, 545 U.S. at 23. Even more importantly, the *Raich* majority focused on the aggregate effect of medical marijuana use in the nine states with similar statutes and found that "Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision is unquestionably substantial." *Raich*, 545 U.S. at 32.

The same can be said here. Congress could rationally have concluded that allowing local firearms commerce to escape federal regulation would severely undercut the comprehensive regulatory scheme set in place by federal firearms

laws.  The rationality of this conclusion is evidenced by the number of states that have already enacted or are contemplating enacting similar Firearms Freedom Act legislation.  This is so regardless of whether or not those locally manufactured firearms were to be emblazoned with a marker identifying the state of manufacture, or whether they ever enter the stream of interstate commerce.

Adding its voice to that of Plaintiffs, State of Montana attempts to distinguish *Raich* and *Stewart* on one more basis.   The State of Montana begins by pointing to the *Raich* Court's discussion regarding the necessity of congressional findings.  The respondents in *Raich* argued that the Controlled Substances Act could not "be constitutionally applied to their activities because Congress did not make a specific finding that the intrastate cultivation and possession of marijuana for medical purposes based on the recommendation of a physician would substantially affect the larger interstate marijuana market." *Raich*, 545 U.S. at 21.

The Court rejected that argument, explaining that "absent a special concern such as the protection of free speech," Congress need not "make particularized findings in order to legislate."  *Raich*, 545 U.S. at 21.   Elaborating further, the Court stated that "[w]hile congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the

connection to commerce is not self-evident, and while we will consider

congressional findings in our analysis when they are available, the absence of

particularized findings does not call into question Congress' authority to

legislate." *Raich*, 545 U.S. at 21.

Based on *Raich*, the Ninth Circuit in *Stewart* placed no significance on the

apparent absence of specific congressional findings regarding the effects of

homemade weapons on the interstate market. *Stewart*, 451 F.3d at 1075. In doing

so, the Court noted there was no special concern that might necessitate

particularized findings. The Court reasoned "that since the Second Amendment

does not grant individual rights" it could not rely on that constitutional provision

"as a basis for requiring Congress to make specific findings in legislation touching

on firearms." *Stewart*, 451 F.3d at 1075 n. 6. The State of Montana argues the

*Stewart* panel's logic is now flawed in view of the United States Supreme Court's

decisions in *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

*Heller* made clear that the Second Amendment does in fact confer an

individual right to keep and bear arms, subject to certain limitations. *Heller*, 128

S.Ct. at 2799. Characterizing the right to keep and bear arms as one that is related

to the inherent right of self-defense, *Heller* described the individual right

conferred by the Second Amendment as the right of "law-abiding, responsible

citizens to use arms in defense of hearth and home." *Heller*, 128 S.Ct. at 2817, 2821.

The fact that *Heller* recognized a Second Amendment right to possess firearms in the home for self-defense does not mean that Congress must have made particularized findings in order to enact a comprehensive regulatory scheme encompassing the intrastate manufacture and sale of firearms. *Heller* specifically contemplated that "the right secured by the Second Amendment is not unlimited," and is subject to regulation. *Heller*, 128 S.Ct. at 2816. The Court cautioned, for example, that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 128 S.Ct. at 2816-17. In fact, the prohibitions are "presumptively lawful regulatory measures." *Heller*, 128 S.Ct. At 2817, n. 26. The federal firearms laws at issue here do just what *Heller* considered appropriate – they impose conditions and qualifications on the manufacture and sale of arms.

Even more importantly, the specific Second Amendment right recognized by *Heller* is simply not implicated in this case. *Heller* recognized that the Second Amendment guarantees the individual right to keep and bear arms, subject to

certain limitations.  But Plaintiffs are not individuals seeking to enforce their

constitutionally protected right to keep and bear arms as articulated in *Heller*.

Instead, they are individuals who essentially claim they have the right to

manufacture and sell firearms within the state of Montana without interference

from the federal government.   *Heller* said nothing about extending Second

Amendment protection to firearm manufacturers or dealers.  If anything, *Heller*

recognized that firearms manufacturers and dealers are properly subject to

regulation by the federal government under existing federal firearms laws.[17]

*Heller*, 128 S.Ct. at 2816-17 (emphasizing that its holding should not be seen as

casting doubt on laws imposing conditions and qualifications on the commercial

sale of arms).

The United States Supreme Court reaffirmed this notion in the even more

recent case of *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020 (2010).  The

Court held in *McDonald* that the Due Process Clause of the Fourteenth

Amendment incorporates the Second Amendment right to possess a handgun in

---

[17] Consistent with *Heller*, a number of lower courts have previously determined or assumed that there is "no Second Amendment right to be a firearm manufacturer or dealer."  *Olympic Arms v. Magaw*, 91 F.Supp.2d 1061, 1071 (E.D. Mich. 2000), *aff'd Olympic Arms, et al. v. Buckles*, 301 F.3d 384 (6th Cir. 2002). *See also United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976); *Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071, 1080-81 (S.D. Ala. 1989).

the home for the purpose of self-defense. *McDonald*, 130 S.Ct. at 3050. In doing

so, the Court repeated the assurances it had made in *Heller*, explaining that its

holding "did not cast doubt on such longstanding regulatory measures as...'laws

imposing conditions and qualifications on the commercial sale of arms.'"

*McDonald*, 130 S.Ct. at 3047 (*quoting Heller*, 128 S.Ct. at 2816-17).

At oral argument, Plaintiffs maintained that in light of the fundamental

nature of the Second Amendment right recognized in *McDonald,* this Court should

apply strict scrutiny to its review of federal firearms laws rather than the rational

basis standard applied by the United States Supreme Court in *Raich*. But Plaintiffs

have not pled a Second Amendment claim in this case. Dkt. 33. Plaintiffs do not

allege that their Second Amendment rights have been violated, and their prayer for

declaratory relief does not even mention the Second Amendment. Dkt. 33.

Because Plaintiffs have not pled a Second Amendment claim, *McDonald* does not

apply.

Even if Plaintiffs had alleged a Second Amendment violation, *McDonald*

says nothing about extending Second Amendment protection to firearm

manufacturers or dealers. Because the United States Supreme Court did not intend

for its holding in *McDonald* and *Heller* to undermine existing laws regulating the

manufacture and sale of firearms, *Raich* and *Stewart* control. Congress was not

required to make particularized findings  that the intrastate manufacture and sale

of firearms, if performed under the constraints set forth in the Act, would

substantially affect the interstate market.

For all of the above reasons, this Court concludes that under *Raich* and

*Stewart*, the National Firearms Act and Gun Control Act constitute a valid

exercise of Congress' Commerce Clause power, even as applied to the purely

intrastate manufacture and sale of firearms contemplated by the Act.

## C.   The Supremacy Clause and the Tenth Amendment

The Supremacy Clause to the United States Constitution reads, in its

entirety, as follows:

> This Constitution, and the Laws of the United States which shall be made in
> Pursuance thereof; and all Treaties made, or which shall be made, under the
> Authority of the United States, shall be the supreme Law of the Land; and
> the Judges in every State shall be bound thereby, any Thing in the
> Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

In other words, "[t]he Supremacy Clause unambiguously provides that if

there is any conflict between federal and state law, federal law shall prevail."

*Raich*, 545 U.S. at 29.  "It is beyond peradventure that federal power over

commerce is 'superior to that of the States to provide for the welfare or necessities

of their inhabitants,' however legitimate or dire those necessities may be."  *Raich*,

545 U.S. 29 (*quoting Maryland v. Wirtz*, 392 U.S. 183, 196 (1968)).  It is well-established that State and Federal law conflict "where it is impossible for a private party to comply with both State and Federal requirements or where State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

The Act is in clear conflict with Federal firearms laws, including the Gun Control Act and National Firearms Act.  The Act purports to exempt Montana small arms manufacturers and dealers, whose activities are confined within the state of Montana,  from requirements imposed by federal law.  In fact, it is the conflict between these state and federal statutory schemes that prompted this litigation.  Because the Federal firearms laws are a valid exercise of Congressional power under the Commerce Clause, even as applied the Plaintiffs' intrastate activities, those federal laws prevail to the extent the Act conflicts with them.[18]

To the extent Plaintiffs argue this results in a Tenth Amendment violation, they are mistaken.  The Tenth Amendment provides that "[t]he powers not

---

[18] Intervenor State of Montana accurately notes that the Supremacy Clause is directed to the judges of every state, and does not operate to circumscribe the state legislatures - or the people - from expressing their views.  *Printz v. United States*, 521 U.S. 898, 912 (1997).  The United States is not suggesting otherwise, as it is indeed the prerogative of Montana's Legislature to riddle the statutory code with "political statements" if the Legislature deems it prudent to do so.  The issue at hand, however, is whether the Act may be relied upon to prevent enforcement of the Federal firearms laws in relation to a firearm manufactured and sold intrastate.

delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the States respectively, or to the people." U.S. Const. amend X. The Tenth Amendment thus reserves to the states those powers not specifically delegated to the federal government.

Where, as here, a federal statute "is within the powers granted to Congress under the Commerce Clause, it cannot constitute an exercise of power reserved to the states." *Columbia River Gorge United - Protecting People and Property v. Yeutter*, 960 F.2d 110, 114 (9th Cir. 1992). If Congress has acted within its power under the Commerce Clause, "the Tenth Amendment expressly disclaims any reservation of power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992). In other words, a valid exercise of Congress' Commerce Clause power is not a violation of the Tenth Amendment.[19] *See e.g. United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995); *Garcia v. San Antonio Metropolitan Trans. Auth.*, 469 U.S. 528 (1985). Because federal firearms laws are a valid exercise of Congress' power under the Commerce Clause as applied to the intrastate activities

_____

[19] Plaintiffs also make a cursory reference to the Ninth Amendment, which provides that "[t]he enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend IX. *See* Dkt. 51-1, at 30-31. The Ninth Amendment does not, as suggested by Plaintiffs, independently secure "any constitutional rights for purposes of making out a constitutional violation." *Schowengerdt v. United States*, 944 F.2d 483, 490 (9th Cir. 1991).

contemplated by the Act, there is no Tenth Amendment violation in this case.

## IV.   Conclusion

For all of the above reasons,

IT IS RECOMMENDED that the United States' motion to dismiss for lack

of subject matter jurisdiction and failure to state a claim upon which may be

granted be GRANTED and this case be dismissed in its entirety.

DATED this 31st day of August, 2010

  /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge